UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
GREENPORT GARDENS, LLC, KEVIN C.
HUDSON, and MARIO CAPUANO,

                  Plaintiff,

        - against -

VILLAGE OF GREENPORT, BUILDING
DEPARTMENT & CODE
ENFORCEMENT; ANDREW SMITH,
individually and in his official capacity as
Village of Greenport Fire Marshal, EDWIN
WARD, individually and in his official
capacity as Village of Greenport Code
Enforcement Officer; EILEEN WINGATE,
individually and in her official capacity as
Village of Greenport Building Inspector;
GEORGE W. HUBBARD, JR., individually
and in his official capacity as Village of
Greenport Mayor; JACK MARTILOTTA,
individually and in his official capacity as
Village of Greenport Deputy Mayor and
Trustee; MARY BESS PHILLIPS,
individually and in her official capacity as
Village of Greenport Trustee; DOUGLAS W.
ROBERTS, individually and in his official
capacity as Village of Greenport Trustee;
JULIA ROBINS, individually and in her
official capacity as Village of Greenport
Trustee; PAUL J. PALLAS, P.E., individually
and in his official capacity as Village of
Greenport Administrator; ROBERT
BRANDT, individually and in his official
capacity as Village of Greenport Treasurer;
GREG MORRIS, individually and in his
official capacity as Village of Greenport Code
Enforcement Officer; and JOHN DOES and
JANE DOES #1-10, individually
and in their official capacities as employees,
agents, and/or assigns of the Village of
Greenport,

                  Defendants.

---------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-2330 (PKC) (ARL)

1

PAMELA K. CHEN, United States District Judge:

In 2018, Plaintiffs Greenport Gardens, LLC ("Greenport Gardens"); Kevin Hudson; and Mario Capuano[1] sued the Village of Greenport (the "Village"); the Village's Building Department & Code Enforcement; Village Code Enforcement Officer Greg Morris; Village Building Inspector Eileen Wingate; Village Mayor George W. Hubbard, Jr.; Village Deputy Mayor and Trustee Jack Martilotta; Village Trustees Mary Bess Phillips, Douglas W. Roberts, and Julia Robins; Village Administrator Paul J. Pallas, P.E.; Village Treasurer Robert Brandt; Village Fire Marshall Andrew Smith; and John/Jane Does #1–10.  Plaintiffs filed an Amended Complaint on January 3, 2020, adding Village Enforcement Officer Edwin Ward as a defendant.  The Amended Complaint alleges, pursuant to 42 U.S.C. § 1983, that various Defendants violated the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution.  It also alleges that Ward, Wingate, Morris, and Smith committed common law trespass.  Finally, the Amended Complaint asserts municipal liability against the Village and the other Defendants in their official capacities.

Defendants move to dismiss the Amended Complaint in its entirety.  For the reasons below, the motion to dismiss is granted in part and denied in part.  Plaintiffs' Fourth Amendment Search claims pursuant to Section 1983 may proceed as to Ward and Wingate, but are dismissed as to all other Defendants.  Plaintiffs' Fifth Amendment Takings claims pursuant to Section 1983 are dismissed as to all Defendants.  Plaintiffs' Eighth Amendment Excessive Fines claims pursuant to Section 1983 are dismissed as to all Defendants.  Plaintiffs' Fourteenth Amendment Equal Protection claims pursuant to Section 1983 may proceed against Ward and Wingate, but are dismissed as to all other Defendants.  Plaintiffs' trespass claims may proceed against Ward and

---

[1] The Amended Complaint, which is the operative complaint in this matter, does not specify Hudson's or Capuano's relationship to Greenport Gardens.  However, certain allegations, discussed below, suggest that they own some or all of Greenport Gardens.

Wingate, but are dismissed without prejudice as to Morris and Smith.  Plaintiffs' municipal liability claims are dismissed.

## BACKGROUND

### I.    Factual Background

The Amended Complaint alleges the following facts, which the Court accepts as true for purposes of this motion.  *See Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012).

In 2013, Greenport Gardens bought an apartment complex in the Village (the "Complex"). (Amended Complaint ("Am. Compl."), Dkt. 22, ¶ 23.)  The Complex is located at 124, 126–128, 133, and 135–137 Ludlum Place, Greenport, NY 11944.  Since purchasing the Complex, Greenport Gardens and Hudson have "leas[ed] [] rental property to persons of Hispanic origin." (*Id.* ¶ 38.)

Defendants Ward and Wingate, respectively, a Village Code Enforcement Officer and a Village Building Inspector, are responsible for authorizing and issuing tickets to properties in the Village that violate municipal codes.  (*See id.* ¶¶ 6–7, 31, 62.)  On January 27, 2016, Hudson "received an email from [a Village] code enforcement [officer] indicating that a mandatory fire inspection needed to be performed on Greenport's rental property."  (*Id.* ¶ 29.)  Plaintiffs "did not consent to or authorize an inspection."  (*Id.* ¶ 31.)  Around January 28, 2016, however, "Hudson received a call from a tenant informing him that a code enforcement officer and building inspector were poking around Hudson's buildings [the day before] and talking with various tenants."  (*Id.* ¶ 30.)

The Complex has a basement, which Plaintiffs keep closed and latched except when the "individual Plaintiffs" use it for "storing tools, equipment, personal items including clothes, shoes etc., eating breakfast, lunch and/or dinner, making phone calls, relaxing, listen[ing] to music,

sleeping, reading, writing, doing paperwork and changing clothes on a regular basis during the week." (*Id.* ¶¶ 25, 59.)[2]  On February 1, 2016, Ward and Wingate "entered onto [P]laintiffs' property at 135-137 A-E and into the basement . . . without a warrant, [and] without the consent of the owners of the property or anybody with authority to go into the . . . basement." (*Id.* ¶ 58.) Later that day, "a Greenport Gardens tenant called [] Hudson to tell him that he saw a code enforcement officer and [] Wingate at the building earlier in the day and that he chased them out of the basement and told them that tenants do not have access to the basement," and that "only the owners do." (*Id.* ¶ 33.)

On February 2, 2016, Hudson met with Wingate. (*Id.* ¶¶ 36–37.)  Wingate acknowledged that "Greenport [Gardens] [] had exclusive dominion and control over the closed and latched basement door located on the property and that Greenport Gardens [] did not consent to entry by anyone onto the property or into the basement." (*Id.* ¶ 37.)  "During Hudson's conversations with [] Wingate," Wingate also said that the Village currently had a "Spanish Problem." (*Id.* ¶ 38.)

Between April 2015 and March 2016, Greenport Gardens and Hudson received tickets from the Village for "permitting parking of abandoned vehicles on their property," "creating a nuisance by having junk visible on their property," "allowing accumulation of litter," "accumulation of rubbish," and "failing to provide and/or maintain fire safety facilities and equipment." (*Id.* ¶ 70.)  The tickets have included fines totaling approximately $5,000. (*Id.*)

From June 5, 2015 through April 24, 2017, Plaintiffs "visited the property of Doug Roberts, Jack Martilotta and Mayor Hubbard's mother and personally observed . . . the same things [Defendants were] charging [P]laintiffs with," including "peeled paint (including paint chips on

---

[2] The Amended Complaint also alleges that "Greenport Gardens" uses the basement, but Plaintiffs do not explain how the corporate entity "uses" a basement for these personal activities. (*See* Am Compl., Dkt. 22, ¶¶ 25, 59.)

4

the grass), rubbish, debris and bicycles on the property," "dangerous electrical wires," and "abandoned and unregistered automobiles." (*Id.* ¶¶ 28, 69.)  For example, on November 19, 2015, Mayor Hubbard's mother had an unregistered vehicle in the driveway of her property." (*Id.* ¶ 28.) These properties "were not occupied by residents of Spanish, Hispanic or non-white origin." (*Id.* ¶ 69.)  Plaintiffs requested information under the Freedom of Information Law and determined that these properties did not receive tickets for the violations. (*Id.*)

Around November 22, 2017, two workers were "changing an exterior door at [Greenport Gardens'] apartment 127 A." (*Id.* ¶ 46.)  Morris and Smith (a Village Code Enforcement Officer and a Village Fire Marshall, respectively), "pulled into the parking lot," which is "on [Plaintiffs'] property" and has "a big No Trespassing sign," and parked. (*Id.* ¶¶ 16–17, 47–49.)  Morris and Smith got out of the car, approached the workers, and asked, "[W]hat is going on?" (*Id.* ¶ 49.)  A worker said they were "just doing some work." (*Id.* ¶ 50.)  "Morris and Smith then walked over to the work area [and] proceeded to examine the door," and "Smith stuck his head into the temporary opening caused by the changing of the exterior door in order to peer into apartment 127 A." (*Id.* ¶ 51.)  Morris and Smith asked the workers about the work they were doing, and the workers responded that they were hanging a door. (*Id.*)  Morris and Smith got back in their car and drove away. (*Id.*)

## II.    Procedural Background

On December 20, 2018, Plaintiffs sued Defendants in the Supreme Court of New York, Suffolk County. (*See* Notice of Removal, Dkt. 1, ¶ 1.)  Plaintiffs served Defendants on April 8, 2019 (*id.* ¶ 2; Dkt. 1-1), and Defendants filed a notice of removal to this Court on April 22, 2019 (Notice of Removal, Dkt. 1).

Plaintiffs filed the Amended Complaint on January 3, 2020. (Am. Compl., Dkt. 22.)  The Amended Complaint alleges, pursuant to Section 1983, that various Defendants violated the

Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution. (*Id*. ¶¶ 57–72.) It also alleges that Ward, Wingate, Morris, and Smith committed common law trespass. (*Id.* ¶¶ 73–94.) Finally, the Amended Complaint asserts municipal liability against the Village and the other Defendants in their official capacities.[3] (*See generally id.* ¶¶ 4–18, 57–94.)

On December 18, 2020, Defendants moved to dismiss the Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of jurisdiction and failure to state a claim on which relief may be granted. (*See* Defendants' Motion to Dismiss ("Defs.' Mot."), Dkt. 32.) Plaintiffs filed a response in opposition to Defendants' motion, (*see* Plaintiffs' Memorandum of Law in Opposition ("Pls.' Opp'n."), Dkt. 34), and Defendants filed a Reply (*see* Defendants' Reply ("Defs.' Reply"), Dkt. 33).

---

[3] Although the Amended Complaint mentions that Defendants violated "Article 1, Sections 7, 11 and 12 of the N.Y. Constitution and case law" (Am. Compl., Dkt. 22, ¶ 67), Plaintiffs fail to mention the New York Constitution in their causes of action. Further, Plaintiffs do not have an implied cause of action under the New York Constitution, given that they may pursue their claims at common law and under Section 1983. *See, e.g.*, *Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016) (summary order) ("The New York State Constitution provides a private right of action where remedies are otherwise unavailable at common law or under § 1983." (citing *Brown v. State of New York*, 652 N.Y.S.2d 223 (N.Y. 1996)); *Bertuzzi v. Copiague Union Free Sch. Dist.*, No. 17-CV-4256 (SJF) (AKT), 2020 WL 5899949, at *28 (E.D.N.Y. Mar. 9, 2020) ("[N]o implied right of action exists for violations of the New York State Constitution where the plaintiff has an alternative remedy under § 1983 for violations of parallel provisions of the U.S. Constitution." (citation and quotations omitted)), *report and recommendation adopted as modified*, 2020 WL 3989493 (E.D.N.Y. July 15, 2020); *Wahad v. F.B.I.*, 994 F. Supp. 237, 240 (S.D.N.Y. 1998) (noting that "the existence of alternative damage remedies under Section 1983 obviates the need to imply a private right of action under the State Due Process Clause"). The Court, therefore, deems the Amended Complaint as failing to allege claims based on violations of the New York Constitution.

## LEGAL STANDARDS

### I.    Dismissal of the Complaint

#### A.    Federal Rule of Civil Procedure 12(b)(1)

Rule 12(b)(1) allows a defendant to move to dismiss a complaint for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "When the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it [], the plaintiff has no evidentiary burden."  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (citation omitted).  "The task of the district court is to determine whether the [p]leading alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue."  *Id.* (citation and quotations omitted).

#### B.    Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) allows a defendant to move to dismiss a complaint for failure to state a claim on which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citation omitted).

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679 (citation omitted).  "In addressing the sufficiency of a complaint, [the Court] accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [the Court is] not

required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

## II.      Matters Outside the Pleadings

"A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (citation and quotations omitted). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Id.* (citations and quotations omitted). "A necessary prerequisite for taking into account materials extraneous to the complaint is that the plaintiff *rely* on the terms and effect of the document in drafting the complaint; mere notice or possession is not enough." *Id.* (citations and quotations omitted).

"When matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (citation, quotations, and brackets omitted). "[V]igorous enforcement of the conversion requirement helps ensure that courts will refrain from engaging in fact-finding when considering a motion to dismiss, and also that plaintiffs are given a fair chance to contest defendants' evidentiary assertions where a court nonetheless does consider evidence extrinsic to the complaint in that context." *Amaker v. Weiner*, 179 F.3d 48, 50 (2d Cir. 1999). "[A] district court errs when it considers affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda, in ruling on a 12(b)(6) motion to dismiss." *Friedl*, 210 F.3d at 83 (citations, quotations, and brackets omitted).

8

## III.   Qualified Immunity

The defense of "[q]ualified immunity is available to officials" in a Section 1983 action "so long as their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Although "qualified immunity should be resolved 'at the earliest possible stage in litigation'" *id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)), "as a general rule, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion," *id.* (citation, quotations, and brackets omitted).  Thus, "a qualified immunity defense can be presented in a Rule 12(b)(6) motion, but . . . the defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004).  "[A] defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *Id.* at 436.  "Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (citations and quotations omitted).  "Thus, the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.*

### DISCUSSION

## I.   Standing

Defendants move to dismiss under Rule 12(b)(1), arguing that the individual Plaintiffs, Hudson and Capuano, lack standing.  The Court finds that Hudson and Capuano have standing to assert some, but not all, claims in this action.

### A.     Legal Standard – Standing

"Article III, Section 2 of the Constitution limits the subject-matter jurisdiction of the federal courts to 'Cases' and 'Controversies.'" *In re Clinton Nurseries, Inc.*, 998 F.3d 56, 63 (2d Cir. 2021) (citation omitted).   "Standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Id.* (citations and quotations omitted).  Standing "cannot be inferred, but must affirmatively appear in the record." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 43 (2d Cir. 2015) (citation and quotations omitted).

"To establish Article III standing, a plaintiff must prove:" (1) "injury-in-fact, which is a concrete and particularized harm to a legally protected interest;" (2) "causation in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant;" and (3) "redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 70 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2508 (2020) (citations and quotations omitted); *accord Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).   "[A]bsent a direct individual injury, a company's member lacks standing to sue for an injury to the company." *Liberty Sackets Harbor LLC v. Vill. Of Sackets Harbor*, 776 F. App'x 1, 3 (2d Cir. 2019) (summary order).

### B.     All Plaintiffs Have Standing

The Amended Complaint lists three Plaintiffs: (1) Greenport Gardens, LLC, (2) Kevin C. Hudson, and (3) Mario Capuano.  (*See* Am. Compl., Dkt. 22, ¶¶ 1–3.)  Defendants do not argue that Greenport Gardens lacks standing.  (*See* Defs.' Mot., Dkt. 32-6, at 3–5); *Cf. Jana-Rock Constr., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195, 200, 204 (2d Cir. 2006) (allowing an Equal Protection claim brought by a construction company and its owner challenging an allegedly discriminatory statute); *accord Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027, 1039 (11th Cir. 2008) ("Courts have routinely found that a business has standing to

bring § 1983 claims against state officials who are harming its business by discriminating against its customers."). Rather, Defendants argue that "[P]laintiffs fail to state the relationship between Greenport Gardens, LLC and the individual plaintiffs, Hudson and Capuano." (Defs.' Mot., Dkt. 32-6, at 5.)

But the Amended Complaint alleges "direct individual injury" to both individual Plaintiffs. *See Liberty Sackets Harbor*, 776 F. App'x at 3. First, Defendants issued tickets to "Greenport Gardens[,] LLC *and* Kevin Hudson" (Am. Compl., Dkt. 22, ¶ 70 (emphasis added)), resulting in "fines in the amount of approximately $5,000.00 being imposed upon Plaintiffs including Kevin Hudson in his individual capacity" (*id.* ¶ 38; *see also id.* ¶ 60). Because these fines are the basis for Plaintiffs' Fifth, Eighth, and Fourteenth Amendment claims, Hudson adequately alleges a direct individual injury as to those claims. *Cf. McElroy v. City of Corvallis*, 67 F. App'x 420, 422 (9th Cir. 2003) (unpublished) ("[Individual plaintiff] McElroy was personally cited for building code violations to which he pleaded no contest and paid a fine. These facts are sufficient to establish that McElroy may have suffered an injury in fact, traceable to the City's alleged discriminatory and tortious conduct, and for which redress is possible."). The Amended Complaint also alleges that "the basement was in the exclusive dominion and control of the owner Greenport Gardens[,] LLC *and individual Plaintiffs*" (*id.* ¶ 26 (emphasis added)), and that the "individual Plaintiffs" used the basement "to change cloths [sic], make phone calls, read and write, eat breakfast, lunch and dinner, conduct daily business, sleep on a daily basis, play music[,] etc" (*id.* ¶ 25). The "individual Plaintiffs," *i.e.*, Hudson and Capuano, thus adequately assert an injury traceable to the alleged trespass into—and unconstitutional search of—the basement by Defendants Ward and Wingate on February 1, 2016.

However, Defendants are right that the Amended Complaint fails to allege that *Capuano* suffered any personal injury from the tickets and fines issued against Greenport Gardens and Hudson.  The Court thus construes the Amended Complaint as asserting the Fifth, Eighth, and Fourteenth Amendment claims on behalf of only Hudson and Greenport Gardens.  The Amended Complaint also fails to allege that Hudson or Capuano suffered a personal injury with respect to the alleged trespass and search by Defendants Morris and Smith on November 22, 2017.  The Court therefore construes those claims as pertaining only to Plaintiff Greenport Gardens.

Thus, the Court finds that Plaintiff Greenport Gardens has standing to bring all claims alleged in the Amended Complaint; that Hudson has standing to bring the claims alleging violations of the Fifth, Eighth, and Fourteenth Amendments; and that Hudson and Capuano have standing to bring the February 1, 2016 trespass and unconstitutional search claims.

## II.      Personal Involvement of Defendants

Defendants argue that some Defendants should be dismissed from this action because of the Amended Complaint's failure to allege their personal involvement in the alleged Section 1983 violations.

Section "1983 does not confer any substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Vill. of Freeport v. Barrella*, 814 F.3d 594, 600 n.8 (2d Cir. 2016) (citation and quotations omitted).  "To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014) (citations omitted).

### A.      Legal Standard – Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir. 2019) (citation and quotations omitted).  "Personal involvement can be established by showing

that:" (1) "the defendant participated directly in the alleged constitutional violation," (2) "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong," (3) "the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom," (4) "the defendant was grossly negligent in supervising subordinates who committed the wrongful acts," or (5) "the defendant exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring." *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (citation, quotations, and alterations omitted).

**B.      Plaintiffs Fail to Allege the Personal Involvement of All Defendants Except Morris, Smith, Ward, and Wingate**

Plaintiffs do not reference Defendants Hubbard, Martilotta, Phillips, Roberts, Robins, Pallas, or Brandt in the Amended Complaint, aside from naming them as Defendants in the caption and "Parties" section of the Amended Complaint, and alleging that they "together created a policy and custom of discrimination against Spanish, Hispanic and non-white people."  (Am. Compl., Dkt. 22, ¶ 64.)[4]  This lone, conclusory allegation is insufficient to plead those Defendants' personal involvement in any constitutional violation pursuant to Section 1983.  *See, e.g.*, *Reynolds v. Barrett*, 685 F.3d 193, 205 (2d Cir. 2012) ("[Although] naming as defendants all of the individuals who could possibly be responsible for [alleged] discrimination may support an inference that one or more of the named individual defendants committed acts of intentional discrimination[,] . . . such evidence provides little or no basis for discerning *which* individual defendants are responsible[.]"); *Richard v. Fischer*, 38 F. Supp. 3d 340, 356 (W.D.N.Y. 2014) (dismissing a Section 1983 claim where the "[p]laintiff allege[d] in a conclusory fashion that [certain defendants]

---

[4] To the extent the Amended Complaint asserts municipal liability claims against Defendants based on a "policy or custom" theory, the Court considers those allegations below.

13

accepted or participated in the alleged conspiracy to deny him employment" because "[t]hese allegations [did] not satisfy the personal involvement requirement to state a § 1983 claim").  The Section 1983 claims against these Defendants, in their personal capacities, therefore must be dismissed for lack of personal involvement.[5]  *See Volpe v. Nassau County*, 915 F. Supp. 2d 284, 299 (E.D.N.Y. 2013) ("It is well-settled that where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted." (citation and quotations omitted)).[6]

Because only Defendants Morris, Smith, Ward, and Wingate are alleged to have personally deprived Plaintiffs of their constitutional rights, the Court considers the claims against these four Defendants below with respect to Defendants' Rule 12(b)(6) motion.

---

[5] Defendants Hubbard, Martilotta, Phillips, Roberts, Robins, Pallas, or Brandt are not named in the trespass claims.

[6] *See also King v. City of New York*, No. 15-CV-3779 (LDH) (VMS), 2019 WL 5653856, at *4 n.7 (E.D.N.Y. Mar. 28, 2019) (dismissing a Section 1983 search claim because "none of the named [d]efendants . . . participated in the alleged searches" and thus "had no personal involvement—a prerequisite to any § 1983 claim"); *Adams v. Simone*, 759 F. App'x 82, 84 (2d Cir. 2019) (summary order) ("Because [the plaintiff] presented no evidence that [the defendant] was personally involved either in her detention or in any warrantless entry into her home, the district court properly granted the defendants' Rule 50 motion as to [that defendant] at the time [the plaintiff] had rested her case."); *Allen v. Antal*, 665 F. App'x 9, 13–14 (2d Cir. 2016) (summary order) ("[The plaintiff's] federal claims against the individual county defendants were properly dismissed because [the plaintiff] failed to allege their 'personal involvement' in his . . . illegal search . . . ."); *McClenic v. Shmettan*, No. 15-CV-705 (SJF) (SIL), 2016 WL 3920219, at *10 (E.D.N.Y. July 15, 2016) ("Since, *inter alia*, [the] plaintiff does not allege the personal involvement of any of the defendants in the purported deprivation of his Eighth Amendment right, nor any facts from which it may reasonably be inferred that any of the defendants were personally involved in the setting of his bail, he fails to state a plausible claim for relief under Section 1983."); *Volpe*, 915 F. Supp. 2d at 298 (dismissing a Section 1983 Equal Protection claim because the complaint failed to allege "personal involvement by a defendant, who must act with discriminatory purpose").

### III.   Fourth Amendment Search

Plaintiffs allege that (1) Ward and Wingate violated their Fourth and Fourteenth Amendment rights by intruding into the basement of the Complex on February 1, 2016 (Am. Compl., Dkt. 22, ¶¶ 58–59), and (2) Morris and Smith violated their Fourth and Fourteenth Amendment rights by driving onto the Complex's parking lot, peering into the workers' van, and peering into an opening in Apartment 127 A on November 22, 2017 (*id.* ¶¶ 75–82).   Defendants move to dismiss as to Ward and Wingate on the grounds that they received consent to search the basement, that Plaintiffs lacked a reasonable expectation of privacy in the basement, and that the "special needs" exception to the warrant requirement permitted them to search the basement. (Defs.' Mot., Dkt. 32-6, at 7–14.)   Defendants move to dismiss as to Morris and Smith on the grounds that Plaintiffs lacked a reasonable expectation of privacy.   (*Id.* at 11–12.)

### A.   Legal Standard – Fourth Amendment

"The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause.'"   *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018) (alterations omitted) (quoting U.S. Const. amend. IV).   "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."   *Id.* (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).   "If a [person] has shown that he had a reasonable expectation of privacy in the place or object in question, the government has the burden of showing that the entry, search, or seizure was lawful because it fell within one of the exceptions to the warrant requirement."   *Id.*

### 1.   Property Ownership

"Fourth Amendment rights are personal rights that may not be asserted vicariously." *United States v. Santillan*, 902 F.3d 49, 62 (2d Cir. 2018) (quoting *Rakas v. Illinois*, 439 U.S. 128,

133 (1978)).  "Accordingly, a [person's] Fourth Amendment rights are violated only when the challenged conduct invades *his* legitimate expectation of privacy rather than that of a third party." *Id.* (citation, quotations, and alterations omitted).

"[M]ere ownership of property does not establish a legitimate expectation of privacy unless the owner vigilantly protects the right to exclude others."  *Gudema v. Nassau Cnty.*, 163 F.3d 717, 722 (2d Cir. 1998); *accord United States v. Cruz*, 475 F. Supp. 2d 250, 257 (W.D.N.Y. 2007) ("Ownership of premises alone does not automatically confer standing.").  "Other factors to be considered include whether the [owner] has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has demonstrated a subjective expectation of privacy, and whether he took precautions to maintain his privacy."  *Id.* at 257–58 (citations omitted).

"Generally, because [landlords] have turned over possession and use of an apartment to its tenants, [they] do not have a protected reasonable expectation of privacy in a rented apartment." *Costello v. Town of Huntington*, No. 14-CV-2061 (JS) (GRB), 2015 WL 1396448, at *9 (E.D.N.Y. Mar. 25, 2015); *see also United States v. Thompson*, No. 18-CR-126 (EAW), 2020 WL 408354, at *5 (W.D.N.Y. Jan. 24, 2020) ("It is well established that a landlord does not have a reasonable expectation of privacy with respect to property that he has rented to a tenant, and that is occupied by that tenant." (citation and quotations omitted)).  On the other hand, landlords retain privacy interests in apartment spaces that remain subject to their "exclusive control."  *See Mangino v. Inc. Vill. of Patchogue*, 814 F. Supp. 2d 242, 254 (E.D.N.Y. 2011) ("[G]iven the uncontroverted evidence that [the landlord] had exclusive control over [a] locked room in the basement and stored his personal items there, [he had] Fourth Amendment standing to challenge any entry and/or inspection of the contents of that room."); *see also Walston v. City of New York*, 289 F. Supp. 3d

16

398, 410 (E.D.N.Y. 2018) ("The expectation of privacy against warrantless searches is only violated if the searched premises is one that [an individual] has the right to keep private and subject to his exclusive control."), *aff'd*, 754 F. App'x 65 (2d Cir. 2019).

 2.   Special Needs Exception

"A warrantless inspection of a private dwelling by a municipal administrative officer without the consent of the owner is generally unreasonable absent specifically delineated circumstances." *Palmieri v. Lynch*, 392 F.3d 73, 78–79 (2d Cir. 2004). "However, 'searches pursuant to a regulatory scheme need not adhere to the usual requirements' where special governmental needs are present." *Id.* at 79 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873–74 (1987)). "The special needs exception recognizes as constitutionally reasonable limited searches or temporary seizures that serve 'special needs beyond the normal need for law enforcement,' where 'the warrant and probable-cause requirement are impracticable.'" *Berg v. Kelly*, 897 F.3d 99, 106 (2d Cir. 2018) (brackets omitted) (quoting *Skinner v. Ry. Lab. Execs. Ass'n*, 489 U.S. 602, 619 (1989)). "Warrantless searches have regularly been allowed when they were conducted pursuant to some legislated regulatory scheme in situations in which there was found to exist a diminished expectation of privacy." *Palmieri*, 392 F.3d at 79 & n.4 (collecting cases).

Still, "that the government has a special need does not mean the [search] is automatically, or even presumptively constitutional." *Jones v. County of Suffolk*, 936 F.3d 108, 118 (2d Cir. 2019) (citation, quotations, and alterations omitted). "Rather, the inquiry into the special needs doctrine and the application of the special needs exception simply allows [a court], to make a constitutional inquiry concerning the government's challenged conduct and to balance or weigh the government's regulatory interests against the individual's protected privacy interest under the Fourth Amendment." *Palmieri*, 392 F.3d at 81.

"In applying the special needs doctrine, courts must assess the constitutionality of the challenged conduct by weighing the government conduct—in light of the special need and against the privacy interest advanced—through the examination of three factors." *Cassidy v. Chertoff*, 471 F.3d 67, 75 (2d Cir. 2006) (citation and quotations omitted).  The factors are: (1) "the nature of the privacy interest involved;" (2) "the character and degree of the governmental intrusion;"[7] and (3) "the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs." *Id.* (citation omitted).

### B.   Plaintiffs' Fourth Amendment Search Claims Are Sufficient Against Ward and Wingate, But Not Against Morris and Smith

#### 1.   Ward and Wingate

Plaintiffs allege that Defendants Ward and Wingate, on February 1, 2016, "entered the basement area" of the Complex, "which had a door which was closed and latched."  (Am. Compl., Dkt. 22, ¶ 59.)  They allege that Plaintiffs "were the only ones authorized to enter [the] basement," and that the basement was "an exclusive private area."  (*Id.*)  Plaintiffs also assert that they used the basement regularly to "stor[e] tools, equipment, personal items including clothes, shoes, etc.," and to eat meals, make phone calls, and change clothes.  (*Id.*)  The Amended Complaint thus alleges sufficient facts to establish that Plaintiffs had a reasonable expectation of privacy in the basement of the Complex.  *See, e.g.*, *Mangino*, 814 F. Supp. 2d at 254 ("[G]iven the uncontroverted evidence that [the landlord] had exclusive control over [a] locked room in the basement and stored

---

[7] With respect to the second factor, "[a]n intrusion is more likely to be classified as 'minimal' if" (1) "the official's sole purpose in entering the property was to conduct a regulatory inspection;" (2) "the employee sought to visually inspect areas outside plaintiff's home, rather than the interior of his house, his personal property, his person, or any closed containers;" (3) "the employee left the premises when asked;" and (4) "the employee was on the premises for only a few minutes."  *Javino v. New York State Dep't of Env't Conservation*, No. 07-CV-0574 (WFK) (ETB), 2013 WL 1946211, at *8 (E.D.N.Y. May 10, 2013) (citing *Palmieri*, 392 F.3d at 84).

his personal items there, [he had] Fourth Amendment standing to challenge any entry and/or inspection of the contents of that room.").

Defendants argue that Plaintiffs lacked a reasonable expectation of privacy because, "prior to the 'search,' [a] tenant of [the Complex] voluntarily consented to the inspection of her apartment and invited Wingate and Ward." (Defs.' Mot., Dkt. 32-6, at 8.) They contend that the tenant "advised Wingate and Ward that there was an unsafe condition in the basement of the premise[s], that she has free access to the basement of the premises as a tenant, and is permitted to bring Wingate and Ward into the basement." (*Id.*)

But nothing about a tenant consenting to the search or having access to the basement appears in the Amended Complaint. Rather, Plaintiffs allege that the search occurred "without [] consent." (Am. Compl., Dkt. 22, ¶ 59.) Defendants instead rely on Ward's affidavit, which is attached to Defendants' motion to dismiss. This is inappropriate on a motion to dismiss. Ward's affidavit simply reflects his and Defendants' *factual* disagreement with the allegations in the Amended Complaint. As defense counsel surely knows, in reviewing a 12(b)(6) motion, the Court must "accept as true all factual allegations" in the complaint, *Rothstein*, 708 F.3d at 94, and "a district court errs when it considers affidavits and exhibits submitted by defendants," *Friedl*, 210 F.3d at 83. Defendants make no argument as to why the Court may consider Ward's affidavit.[8] Thus, based on the allegations in the Amended Complaint, the Court cannot conclude that

---

[8] Although "[w]hen matters outside the pleadings are presented in response to a 12(b)(6) motion, [the Court could] . . . convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material[,]" *Friedl*, 210 F.3d at 83, doing so here would plainly run afoul of the general prohibition against district courts engaging in factfinding at the motion-to-dismiss stage of the proceedings. *See Amaker*, 179 F.3d at 50 (noting that the "conversion requirement helps ensure that courts will refrain from engaging in fact-finding when considering a motion to dismiss").

Defendants Ward and Wingate had consent to enter the basement of the Complex on February 1, 2016.

Defendants also argue that the special needs exception applies and that "[P]laintiffs were on notice that the Village required a mandatory fire inspection be performed of its rental properties." (Defs.' Mot., Dkt. 36-2, at 9.)  First, they address "the nature of the privacy interest involved," *Cassidy*, 471 F.3d at 75 (citation omitted), and argue that Plaintiffs had only a minimal privacy interest in the basement.  But Defendants merely reiterate their contention that landlords lack a privacy interest in a space leased to tenants.  As explained, however, Plaintiffs allege that they had "exclusive dominion and control" over the basement and used it regularly for personal activities.

Defendants also identify Sections 704.2 and 701.2 of the Property Maintenance Code of New York State,[9] and Village Code Chapter 103, which apparently authorize inspections of rental properties.  (Defs.' Mot., Dkt. 36-2, at 13.)  But although the Amended Complaint notes that Plaintiff Hudson "received an email from Ward informing him that a mandatory fire safety inspection needed to be scheduled as soon as possible" (Am. Compl., Dkt. 22, ¶ 34), the allegations do not clarify whether Ward and Wingate's intrusion into the basement was part of any scheduled inspection pursuant to a regulation.  Rather, the Amended Complaint alleges that "Plaintiff's [sic] did not consent to or authorize an inspection."  (*Id.* ¶ 31.)  Although discovery may shed light on

---

[9] Section 701.2 says: "Responsibility. The *owner* of the *premises* shall provide and maintain such fire safety facilities and equipment in compliance with requirements.  A person shall not occupy as *owner-occupant* or permit another person to occupy any *premises* that do not comply with the requirements of this chapter."  NEW YORK STATE, 2020 PROPERTY MAINTENANCE CODE OF NEW YORK STATE 29 (2019), https://dos.ny.gov/system/files/documents/2020/09/2020-pmcnys-november-2019.pdf ("PROPERTY MAINTENANCE CODE").  Section 704.2 says: "Standards. Fire protection systems shall be inspected, tested and maintained in accordance with the referenced standards listed in [a separate table] and as required in this section," and provides the referenced table.  *Id.* at 30.

whether Defendants Ward and Wingate entered the basement pursuant to a valid regulatory duty, the facts alleged in the Amended Complaint do not support Defendants' special-needs argument.

Second, Defendants address "the character and degree of intrusion." *Cassidy*, 471 F.3d at 75 (citation omitted). They rely on Ward's affidavit to argue that "the inspections of the premises basement were limited to what was visually observable and minimally intrusive." (Defs.' Mot., Dkt. 32-6, at 14.) Again, however, it would be improper, and the Court declines, to rely on Defendant Ward's affidavit in resolving Defendants' motion to dismiss.

Third, Defendants address "the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs." *Cassidy*, 471 F.3d at 75 (citation omitted). But Defendants again rely on Ward's affidavit and arguments about a tenant's consent. (*See* Defs.' Mot., Dkt. 32-6, at 14.) For the reasons given, the Court declines to consider Ward's testimony.

Defendants also argue that "[e]ven assuming Wingate and Ward violated [P]laintiffs' [F]ourth [A]mendment right by inspecting the basement without a warrant, Wingate's and Ward's actions were objectively reasonable in light of the tenant's consent to inspect the premises," such that they are entitled to qualified immunity. (*Id.* at 20.) This argument obviously fails for the same reason. Ward's affidavit, the only source of the "consent" theory, cannot be considered in assessing qualified immunity any more than in assessing Defendants' motion to dismiss for failure to state a claim. *See, e.g.*, *McKenna*, 386 F.3d at 434 ("[A] defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route," and "the facts supporting the defense [must] appear on the face of the complaint[.]" (citations and quotations omitted)).

Again, although Defendants ultimately may be able to establish an evidentiary basis for their arguments, they cannot do so before discovery and before Plaintiffs have had the opportunity

to contest their evidence.  Defendants' motion to dismiss with respect to the Fourth Amendment claim against Ward and Wingate pursuant to Section 1983 therefore must be denied.

2.    Morris and Smith

Plaintiffs' Fourth Amendment claims against Morris and Smith are another matter. Plaintiffs allege that on November 22, 2017, Defendants Morris and Smith drove a van into the Complex's parking lot while workers were changing the exterior door of one of the apartments. (Am. Compl., Dkt. 22, ¶¶ 79–80.)  Morris and Smith "peer[ed] into the workers' van, which was parked in the adjacent parking lot." (*Id.* ¶ 81.)  They "then walked over to the work area, proceeded to examine the door, [and] peered into [A]partment 127 A through the temporary opening caused by the changing of the exterior door." (*Id.* ¶ 82.)

As noted, "Fourth Amendment rights are personal rights that may not be asserted vicariously," and "a defendant's Fourth Amendment rights are violated only when the challenged conduct invades *his* legitimate expectation of privacy rather than that of a third party." *Santillan*, 902 F.3d at 62 (citation, quotations, and alterations omitted).  Further, "mere ownership of property does not establish a legitimate expectation of privacy unless the owner vigilantly protects the right to exclude others." *Gudema*, 163 F.3d at 722.  Aside from Greenport Gardens' role as owners of the Complex, Plaintiffs here do not attempt to identify an expectation of privacy in Apartment 127 A or the workers' van.  Unlike the basement, the Amended Complaint does not allege that Plaintiffs had exclusive control over Apartment 127 A.  They do not mention, for example, whether Apartment 127 A was occupied by a tenant on November 22, 2017.  *See Costello*, 2015 WL 1396448, at *9; *see also Thompson*, 2020 WL 408354, at *5 ("It is well established that a landlord does not have a reasonable expectation of privacy with respect to property that he has rented to a tenant, and that is occupied by that tenant." (citation and quotations omitted)).

22

And even if Plaintiffs could or did have a general privacy interest in Apartment 127 A on that date, they do not adequately allege that Morris and Smith violated a reasonable expectation of privacy.  Plaintiffs do not allege that Morris or Smith approached the "exterior door" via a route that members of the public would not have taken.  *See United States v. Reyes*, 283 F.3d 446, 465 (2d Cir. 2002) (noting that "the route which any visitor to a residence would use is not private in the Fourth Amendment sense" (citation and brackets omitted)).  Further, the Amended Complaint alleges only that Morris and Smith looked through an *opening* in the *exterior* doorway.  "No reasonable expectation of privacy inheres in what is left 'visible to the naked eye,'" *United States v. Gori*, 230 F.3d 44, 50 (2d Cir. 2000) (quoting *Florida v. Riley*, 488 U.S. 445, 450 (1989)), and "a truly cursory inspection—one that involves merely looking at what is already exposed to view, without disturbing it—is not a 'search' for Fourth Amendment purposes," *Arizona v. Hicks*, 480 U.S. 321, 328 (1987).  *See also Beganskas v. Town of Babylon*, No. 03-CV-287 (DLI) (JO), 2006 WL 2689611, at *2 (E.D.N.Y. Sept. 19, 2006) (granting summary judgment to a defendant who "walked around the perimeter of [the plaintiff's] front yard and up her driveway to the front door where he looked through a window into her home," because "[a] mere 'visual observation' of an object already exposed to public view is no search at all" (quoting *Palmieri*, 392 F.3d at 81)).  The "No Trespassing" signs do not compel a different conclusion.  *Cf.  Marom v. Town of Hempstead*, No. 14-CV-3005 (SJF) (ARL), 2017 WL 5495808, at *6 (E.D.N.Y. Mar. 22, 2017) ("The fact that Plaintiff may have posted a 'no trespass' sign on a fence near the driveway makes no difference for Fourth Amendment purposes."), *aff'd*, 710 F. App'x 38 (2d Cir. 2018); *Beganskas*, 2006 WL 2689611, at *3 ("Even assuming plaintiff had a Fourth Amendment interest given the 'No Trespass' sign, [the defendant's] 'visual observation' along a route any visitor would use did not constitute a search for Fourth Amendment purposes." (quoting *Palmieri*, 392 F.3d at 81)).

23

Plaintiffs' Fourth Amendment claim pursuant to Section 1983 with respect to Defendants Morris and Smith therefore must be dismissed.

## IV.    Fifth Amendment Taking

Plaintiffs allege that the tickets and fines they received for various purported code violations amount to a constitutional taking of their property under the Fifth and Fourteenth Amendments.  (Am. Compl, Dkt. 22, ¶¶ 67–70.)

### A.    Legal Standard – Fifth Amendment Takings Clause

"The Takings Clause of the Fifth Amendment states that 'private property shall not be taken for public use, without just compensation.'" *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2167 (2019) (quoting U.S. Const. amend. V) (brackets omitted).[10]  "If a local government takes private property without paying for it, that government has violated the Fifth Amendment . . . ." *Id.* at 2170.  "[T]he property owner may sue the government at that time in federal court for the 'deprivation' of a right 'secured by the Constitution.'" *Id.* (quoting 42 U.S.C. § 1983).

"The Supreme Court has recognized two branches of Takings Clause cases: physical takings and regulatory takings." *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 263 (2d Cir. 2014) (citing *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002)).  "A physical taking occurs when there is either a condemnation or a physical

---

[10] Defendants argue that "the Fifth Amendment only applies to actions by the Federal Government, and Plaintiffs have not named the U.S. government or any agency or employee thereof as a defendant in this matter."  (Defs.' Mot., Dkt. 32-6, at 15 (citation and quotations omitted).)  But "Plaintiffs' reliance on the Fifth Amendment is construed as an invocation of the Fourteenth Amendment, because the latter applies to due process violations or takings by state rather than federal actors and Plaintiffs have not alleged any wrongdoing by federal actors." *Sibiski v. Cuomo*, No. 08-CV-3376 (SJF) (ARL), 2010 WL 3984706, at *8 (E.D.N.Y. Sept. 15, 2010) (citation and quotations omitted).

appropriation of property." *Id.* "A regulatory taking, by contrast, occurs where even absent a direct physical appropriation, governmental regulation of private property 'goes too far' and is 'tantamount to a direct appropriation or ouster.'" *Id.* (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005)).

"The Supreme Court has 'generally eschewed any set formula' for identifying regulatory takings, instead 'preferring to engage in essentially ad hoc, factual inquiries' to determine in each case whether the challenged property restriction rises to the level of a taking." *Id.* at 264 (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992)). "Paramount to the inquiry are the familiar factors set forth in" *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978). *Id.* "Primary among those factors are the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Id.* (brackets omitted) (quoting *Lingle*, 544 U.S. at 538–39). "Also telling, is the 'character of the governmental action,' particularly 'whether it amounts to a physical invasion' or appropriation of property or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Id.* (quoting *Lingle*, 544 U.S. at 539).

"When a plaintiff alleges a regulatory taking in violation of the Fifth Amendment, a federal court should not consider the claim before the government has reached a 'final' decision." *Pakdel v. City & Cnty. of San Francisco, California*, 141 S. Ct. 2226, 2228 (2021) (per curiam) (quoting *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 737 (1997)). "After all, until the government makes up its mind, a court will be hard pressed to determine whether the plaintiff has suffered a constitutional violation." *Id.* Under the finality requirement, "a plaintiff must show [] that 'there is no question about how the regulations at issue apply to the particular land in question.'" *Id.* at

2230 (quoting *Suitum*, 520 U.S. at 739).  The plaintiff must show that he or she "has actually 'been injured by the Government's action' and is not prematurely suing over a hypothetical harm."  *Id.* (quoting *Horne v. Dep't of Agric.*, 569 U.S. 513, 525 (2013)).  "Along the same lines, because a plaintiff who asserts a regulatory taking must prove that the government 'regulation has gone too far,' the court must first 'know how far the regulation goes.'"  *Id.* (brackets omitted) (quoting *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986)).  "Once the government is committed to a position, however, these potential ambiguities evaporate and the dispute is ripe for judicial resolution."  *Id.*

### B.    Plaintiffs Do Not Adequately Plead a Fifth Amendment Taking

Plaintiffs allege that "Wingate and [] Ward directly participated in the violation of [P]laintiffs' Fourteenth Amendment right by issuing or authorizing" the tickets and fines against Plaintiffs.  (Am. Compl., Dkt. 22, ¶ 62.)[11]  Plaintiffs do not allege that Ward or Wingate "condemn[ed] or [] physical[ly] appropriate[ed] [their] property," *Calloway*, 761 F.3d at 263, so the Court must determine whether these Defendants effected a regulatory taking.  Important considerations thus include (1) "the economic impact of the" fines, (2) "the extent to which the [fines] ha[ve] interfered with [Plaintiffs'] distinct investment-backed expectations," and (3) "the character of the" fines.  *Id.* at 264 (citation and brackets omitted).

---

[11] The Amended Complaint does not allege that Morris or Smith were involved with the tickets and fines.  With respect to the remaining individual Defendants, the Amended Complaint alleges only that they "together created a policy and custom of discrimination against Spanish, Hispanic and non-white people," and that the tickets and fines were "in furtherance of that policy and custom."  (Am. Compl., Dkt. 22, ¶ 64.)  These cursory allegations are insufficient to plead that any Defendant other than Ward and Wingate was personally involved in a Fifth Amendment regulatory taking.  *See, e.g.*, *Richard*, 38 F. Supp. 3d at 356 (dismissing a Section 1983 claim where the "[p]laintiff allege[d] in a conclusory fashion that [certain defendants] accepted or participated in the alleged conspiracy to deny him employment" because "[t]hese allegations [did] not satisfy the personal involvement requirement to state a § 1983 claim").

Considering these three factors, the Court concludes that the Amended Complaint fails to state a regulatory-takings claim.  First, while Plaintiffs allege that "tickets were issued whose fines amounted to approx[imately] $5,000.00" (Am. Compl., Dkt. 22, ¶ 70), they do not say whether they paid these fines or, if they did, what economic impact those payments had on Plaintiffs. Although they assert that the fines were *intended* to "make doing business in [the Village] cost[-]ineffective and overly burdensome" (*id.* ¶ 60), they do not make any claims about the actual impact of the fines.  The first factor thus weighs against a regulatory taking.  *See, e.g.*, *Kabrovski v. City of Rochester, New York*, 149 F. Supp. 3d 413, 424 (W.D.N.Y. 2015) (finding that the first factor weighed against a taking because "the [c]omplaint [did] not indicate the economic impact that the [d]efendants' actions [] had on the [p]laintiff, except in vague and conclusory terms").

Second, the Amended Complaint does not contain any allegations about "the extent to which the [fines] ha[ve] interfered with [Plaintiffs'] distinct investment-backed expectations." *Calloway*, 761 F.3d at 264.  "By omitting discussion of investment-backed expectations, the pleading fails to plausibly allege a taking under this factor."  *Lebanon Valley Auto Racing Corp. v. Cuomo*, 478 F. Supp. 3d 389, 401 (N.D.N.Y. 2020) (citation and quotations omitted).  Although Plaintiffs allege that the tickets and fines were "baseless" (Am. Compl., Dkt. 22, ¶ 66), the Complaint also admits that the tickets were issued for "permitting parking of abandoned vehicles on their property," "creating a nuisance by having junk visible on their property," "allowing accumulation of litter," "accumulation of rubbish," and "failing to provide and/or maintain fire safety facilities and equipment" (*id.* ¶ 70).  There is no indication that Plaintiffs expected to be able to engage in these activities without incurring tickets and fines. *Cf. Kabrovski*, 149 F. Supp. 3d at 425 (finding that the second factor weighed against the plaintiffs because "[t]he pleading [did] not allege that [they] had any reasonable expectation that they would be able to have

27

unrestricted live outdoor amplified music under the zoning code," which they challenged as a regulatory taking); *see also Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 167 (S.D.N.Y. 2020) (noting, in considering the second factor, that "landlords understand that the contractual right to collect rent is conditioned on compliance with a variety of state laws").

Third, Plaintiffs have not alleged "interference with property [that] can be characterized as a physical invasion by government," which "may more readily be found" to be a taking. *Sherman v. Town of Chester*, 752 F.3d 554, 565 (2d Cir. 2014) (quoting *Penn Central*, 438 U.S. at 124). The tickets imposed only monetary fines. The third factor thus weighs against a taking. *Cf. Kabrovski*, 149 F. Supp. 3d at 426 (finding that the third factor weighed against a taking "since [the regulation at issue] involve[d] no physical invasion, and since it [was] designed to ensure that city residents . . . can enjoy their property without being disturbed by excessive noise from outdoor amplified concerts").

The Amended Complaint thus fails to state a Fifth Amendment Takings claim pursuant to Section 1983.[12]

## V.   Eighth Amendment Excessive Fines

Plaintiffs also allege that the fines accompanying the tickets were excessive under the Eighth Amendment.  (Am. Compl., Dkt. 22, ¶ 67.)

---

[12] Defendants also argue that Plaintiffs' "regulatory takings claims are not ripe" because they "fail to allege that 'the government entity charged with enforcing the regulations at issue rendered a final decision.'"  (Defs.' Mot., Dkt. 32-6, at 15 (quoting *Southview Assoc., Ltd. v. Bongartz*, 980 F.2d 84, 95 (2d Cir. 1992)).)  But Plaintiffs adequately allege that they incurred "concrete fines and penalties at the time they sought judicial review," which is "sufficient 'injury' for federal jurisdiction."  *See Horne*, 569 U.S. at 525.  That they do not allege that an agency upheld the fines against them is unnecessary.  *See, e.g.*, *Pakdel*, 141 S. Ct. at 2230 ("The finality requirement is relatively modest.  All a plaintiff must show is that there is no question about how the regulations at issue apply to the particular land in question." (citation, quotations, and alterations omitted)).

## A.      Legal Standard – Eighth Amendment Excessive Fines Clause

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.[13]  "The Supreme Court first applied the Excessive Fines Clause in *United States v. Bajakajian*, 524 U.S. 321 (1998), which established a two-step inquiry for determining whether a financial penalty is excessive under the Eighth Amendment."  *United States v. Viloski*, 814 F.3d 104, 108 (2d Cir. 2016).  "First, [courts] must determine whether the forfeiture at issue constitutes 'a "fine" within the meaning of the Excessive Fines Clause.'"  *Id.* at 109 (quoting *Bajakajian*, 524 U.S. at 334).  "That clause applies only to those forfeitures that may be characterized, at least in part, as 'punitive'—*i.e.*, forfeitures for which a defendant is personally liable."  *Id.* (quoting *Bajakajian*, 524 U.S. at 327–28).  "Civil fines that seek to deter rule-breaking or enforce compliance are punitive in character."  *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 198 (S.D.N.Y. 2019).  "If [a court] determine[s] that a forfeiture is punitive, [it] must proceed to step two, which asks whether the forfeiture is unconstitutionally excessive."  *Viloski*, 814 F.3d at 110.

"A forfeiture is unconstitutionally excessive 'if it is grossly disproportional to the gravity of a defendant's offense.'"  *Id.* (quoting *Bajakajian*, 524 U.S. at 334).  Courts assess proportionality using "four factors, which have become known as the '*Bajakajian* factors.'"  *Id.* These are: (1) "the essence of the [offense] and its relation to other [unlawful] activity," (2) "whether the [offender] fits into the class of persons for whom the statute was principally designed," (3) "the maximum sentence and fine that could have been imposed," and (4) "the nature of the harm caused by the [offender's] conduct."  *United States v. George*, 779 F.3d 113, 122 (2d

---

[13] The Excessive Fines Clause of the Eight Amendment applies to the States through the Fourteenth Amendment.  *See Timbs v. Indiana*, 139 S. Ct. 682, 689 (2019).

Cir. 2015) (citation omitted).  "The burden rests on the [challenger of the fine] to show the unconstitutionality of the forfeiture."  *United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010); *see also N.Y.S. Fed'n of Taxi Drivers, Inc. v. City of New York*, 270 F. Supp. 2d 340, 343 (E.D.N.Y. 2003) (dismissing a complaint that "state[d] no claim that any individual penalty, ranging in amount from $15.00 to $1,000.00, depending upon the type of offense and the number of summonses issued for the same offense, was excessive under the Eighth Amendment or 'grossly disproportionate' under *Bajakajian*").

### B.      Plaintiffs Fail to Adequately Plead Their Eighth Amendment Claim

Plaintiffs' Eighth Amendment Excessive Fines claim alleges only Ward's and Wingate's personal involvement.  The Court thus considers whether the Amended Complaint states an Excessive Fines claim against those two Defendants.

Defendants do not contest that the fines imposed on Plaintiffs were, at least "in part, punitive."  (Defs.' Mot., Dkt. 32-6, at 17.); *see also Farina*, 409 F. Supp. 3d at 198 ("Civil fines that seek to deter rule-breaking or enforce compliance are punitive in character.").  The question thus is whether the fines were "grossly disproportional to the gravity of [Plaintiffs'] offense." *Viloski*, 814 F.3d at 110 (quoting *Bajakajian*, 524 U.S. at 334).  As noted, "[t]he burden rests on" Plaintiffs, *Castello*, 611 F.3d at 120, to establish disproportionality based on (1) "the essence of the [offenses]," (2) "whether [Plaintiffs] fit[] into the class of persons for whom the [regulations at issue were] principally designed," (3) "the maximum . . . fine that could have been imposed," and (4) "the nature of the harm caused by [Plaintiffs'] conduct," *George*, 779 F.3d at 122 (citation omitted).

As to the first element, the tickets charge Plaintiffs with "permitting parking of abandoned vehicles on their property," "creating a nuisance by having junk visible on their property," "allowing accumulation of litter," "accumulation of rubbish," and "failing to provide and/or

30

maintain fire safety facilities and equipment." (Am. Compl., Dkt. 22, ¶ 70.) While the fines amounted to approximately $5,000, that was for a total of 20 tickets issued over the course of a year, not a penalty for a "one-time failure" to comply with municipal ordinances. *See George*, 779 F.3d at 123. And although Plaintiffs contend in conclusory fashion that the tickets were "baseless" (*see, e.g.*, Am. Compl., Dkt. 22, ¶ 60), they do not provide any factual basis to dispute that they committed the underlying infractions.

As to the second element, Plaintiffs do not allege that they fall outside of the class of persons for whom the ticketing regulations were designed. Greenport Gardens owned the Complex (*see* Am. Compl., Dkt. 22, ¶ 23), so it appears to be the precise subject of the Property Maintenance Code of New York State, which regulates "all existing residential and nonresidential structures" and "constitute[s] minimum requirements and standards for *premises*, structures, equipment and facilities for light, *ventilation*, space, heating, sanitation, protection from the elements, a reasonable level of safety from fire and other hazards, and for a reasonable level of sanitary maintenance." 101.2 Scope, PROPERTY MAINTENANCE CODE, at 1. And the Amended Complaint fails to allege Hudson's role with respect to the Complex, let alone that he falls outside the class of persons for whom the regulations were intended. *See Castello*, 611 F.3d at 120 ("The burden rests on the [challenger of the fine] to show the unconstitutionality[.]").

As to the third element, Plaintiffs do not allege any facts with respect to "the maximum . . . fine that could have been imposed." *George*, 779 F.3d at 122 (citation omitted). Nor do they allege how much they were charged under each ticket. They merely assert that the total "fines amounted to approx[imately] $5,000.00." (Am. Compl., Dkt. 22, ¶ 70.) This plainly is insufficient to show gross disproportionality. *See Castello*, 611 F.3d at 120 ("The burden rests on the [challenger of the fine] to show the unconstitutionality[.]").

Finally, with respect to the nature of the harms caused by Plaintiffs' conduct, they appear to vary from sanitary to fire-safety infractions, which seem to be legitimate bases for fines. But Plaintiffs do not allege any facts regarding this element. *See id.*

Ultimately, Plaintiffs make no allegations suggesting that the fines Defendants imposed were excessive. They merely assert that they received 20 tickets totaling approximately $5,000. Further, Plaintiffs' failure to specify how much they actually paid for each ticket prevents the Court from adequately assessing disproportionality. *See, e.g.*, *Farina*, 409 F. Supp. 3d at 200 ("[T]he failure to identify the fines actually paid are fatal to [the plaintiff's] claim because they foreclose an analysis of the four-factor *Bajakajian* test."). Because "[t]he burden rests on the [challenger of the fine] to show the unconstitutionality," *Castello*, 611 F.3d at 120, Plaintiffs fail to state an Eighth Amendment Excessive Fines claim, *see, e.g.*, *Azeez v. City of New York*, No. 16-CV-342 (NGG) (SJB), 2018 WL 4017580, at *13 (E.D.N.Y. Aug. 22, 2018) (dismissing an Excessive Fines claim where the plaintiff failed to allege facts suggesting the amounts of the fines were unreasonable), *aff'd*, 790 F. App'x 270 (2d Cir. 2019).

## VI. Fourteenth Amendment Discrimination

The Amended Complaint also alleges that Defendants violated the Equal Protection Clause of the Fourteenth Amendment by selectively enforcing municipal codes against them due to their leasing of property to Hispanic, Spanish, and non-white tenants.

### A. Legal Standard – Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. "To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race." *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000). A plaintiff may do so by

32

"pointing to a law that expressly classifies on the basis of race, a facially neutral law or policy that has been applied in an unlawfully discriminatory manner, or a facially neutral policy that has an adverse effect and that was motivated by discriminatory animus." *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009) (citation and quotations omitted).

The Second Circuit "first articulated a theory of Equal Protection based on the selective enforcement of the law in *LeClair v. Saunders*, a case decided nearly four decades ago." *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019) (citing *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980)). "To prevail on such a claim, a plaintiff must prove that" (1) "the person, compared with others similarly situated, was selectively treated," and (2) "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race[.]" *Id.* (citations and quotations omitted). "As this test makes clear, the *LeClair* type of equal protection claim requires proof of disparate treatment and impermissible motivation." *Id.* (citation, quotations, and brackets omitted). "The question of whether parties are similarly situated is generally a fact-intensive inquiry that depends heavily on the particular context of the case at hand." *Id.* at 97 (citation, quotations, and brackets omitted). "[I]t is precisely in light of the inquiry's fact-intensive nature that [the Second Circuit has] cautioned against deciding whether two comparators are similarly situated on a motion to dismiss." *Id.* (citation omitted).

### B.   Plaintiffs Adequately Plead a Fourteenth Amendment Equal Protection Violation by Ward and Wingate

Plaintiffs allege that Defendants Ward and Wingate discriminated against "persons of Hispanic origin" by subjecting Plaintiffs to "baseless" tickets and "excessive fines" (Am. Compl., Dkt. 22, ¶¶ 38, 60) "because [Plaintiffs] had Hispanic tenants and [Defendants] [do] not want Spanish, Hispanic or non-white tenants or residents" in the Village (*id.* ¶ 61). Plaintiffs claim that "Wingate and [] Ward directly participated in the violation of [Plaintiffs'] Fourteenth Amendment

33

right by issuing and[/]or authorizing [the tickets] as the Chief Building Inspector" and Code Enforcement Officer.  (*Id.* ¶ 62.)[14]

As a threshold matter, Defendants point out in their Reply that "the individual plaintiffs are not members of a suspect or quasi-suspect class."  (Defs.' Reply, Dkt. 33-2, at 7.)  This is correct.  Plaintiffs do not plead that they are "Hispanic, Spanish, or non-white," or that Defendants discriminated against them based on *their* race.  Rather, Plaintiffs allege that Defendants discriminated against them for leasing property to Hispanic, Spanish, or non-white tenants.  Even so, a plaintiff "has standing to bring [a] § 1983 claim . . . alleging that he was singled out for disadvantageous treatment by [defendants] who, acting under the color and authority of law, selectively enforced [municipal] laws and codes because they believed [the] plaintiff was in a rental contract with or otherwise associated with his [minority-race] tenants." *Puglisi v. Underhill Park Taxpayer Ass'n*, 947 F. Supp. 673, 689 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 844 (2d Cir. 1997). This reasoning stems from *Sullivan v. Little Hunting Park, Inc.* 396 U.S. 229, 234–35, 237 (1969), where the Supreme Court held that a white plaintiff had standing under 42 U.S.C. § 1982[15] when a corporation expelled him for attempting to assign one of his membership shares to black person.

---

[14] Although Plaintiffs allege that "Defendants [Hubbard, Martilotta, Phillips, Roberts, Robins, and Pallas], the Village's policy creators, together created a policy and custom of discrimination against Spanish, Hispanic and non-white people" (Am. Compl., Dkt. 22 ¶ 64), Plaintiffs do not allege that anyone other than Ward and Wingate had the decision-making authority to, or were personally involved in, ticketing them.  To the extent Plaintiffs allege that defendants other than Ward and Wingate violated their Equal Protection rights, those claims are dismissed.  *See Volpe*, 915 F. Supp. 2d at 298–99 (dismissing a Section 1983 Equal Protection claim because the complaint failed to allege "personal involvement by a defendant, who must act with discriminatory purpose").

[15] Section 1982 guarantees that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."  42 U.S.C. § 1982.

The Second Circuit likewise held that a plaintiff had standing under 42 U.S.C. § 1981[16] when he

"contend[ed] that [the defendant] 'forced' him into retirement solely because he had sold his house

to a black person." *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, 312 (2d Cir. 1975), *modified*

*on other grounds*, 520 F.2d 409 (2d Cir. 1975).  The question thus is whether Plaintiffs adequately

allege that Defendants selectively enforced municipal regulations against them based on the

impermissible motive that Plaintiffs leased property to Hispanic, Spanish, and non-white tenants.

*Cf. Mazzone v. Town of Southampton*, 283 F. Supp. 3d 38, 50 (E.D.N.Y. 2017) (finding that the

plaintiff had stated an Equal Protection claim where he "[did] not claim to be a member of a

constitutionally protected class; rather, he allege[d] that he was singled out because he assisted

poor Hispanic immigrants obtain rentals").[17]  As the court explained in *Mazzone*, "[u]nder these

circumstances, Plaintiff may bring an Equal Protection claim pursuant to one of two theories:

---

[16] Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."  42 U.S.C. § 1981.

[17] *See also Pisello v. Town of Brookhaven*, 933 F. Supp. 202, 212 (E.D.N.Y. 1996) (finding that a management company had standing to maintain equal protection claims under § 1983 where the plaintiff alleged it was singled out for enforcement actions due to its efforts to place minority tenants in local rental housing); *Young*, 529 F.3d at 1039 (reversing dismissal of a Section 1983 claim alleging that the defendants "enacted and enforced [an ordinance] in order to harass landlords who provide affordable housing to Hispanic immigrants"); *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1055 (9th Cir. 2002) ("[P]laintiffs who are not members of the protected class have standing to challenge racially discriminatory conduct in their own right when they are the direct target of the discrimination."); *Scott v. Greenville County*, 716 F.2d 1409, 1415 (4th Cir.1983) (concluding that a non-minority housing developer had standing to make an equal protection claim under § 1983, because "if defendants singled out [the plaintiff] for disadvantageous treatment because of his willingness to house minority tenants, then [the plaintiff] in his own stead suffered injury to his right to be free from official discrimination"); *Des Vergnes v. Seekonk Water Dist.*, 601 F.2d 9, 17 (1st Cir.1979) (finding that a real estate corporation had standing under § 1983 to allege that a state municipal corporation discriminated against it for its willingness to sell housing to low-income and minority families), *vacated on other grounds*, 454 U.S. 807 (1981).

selective enforcement or 'class of one.'" *Id.* (citation omitted), *report and recommendation adopted as modified*, No. 16-CV-4515 (JFB) (ARL), 2017 WL 6017357 (E.D.N.Y. Dec. 1, 2017).

To raise an inference of selective enforcement and discriminatory intent, Plaintiffs allege that they "visited the property of Doug Roberts, Jack Martilotta and Mayor Hubbard's mother and personally observed . . . the same things [Defendants were] charging [P]laintiffs with," but that "these properties were not issued code violations as [they] were not occupied by residents of Spanish, Hispanic or non-white origin." (Am. Compl., Dkt. 22, ¶ 69.)  According to Plaintiffs, these properties had "the exact same conditions," including "peeled paint (including paint chips on the grass), rubbish, debris and bicycles on the property," "dangerous electrical wires," and "abandoned and unregistered automobiles." (*Id.* ¶ 28.)  Plaintiff Hudson further alleges that Defendant Wingate told him "that the Village of Greenport currently has a 'Spanish problem.'" (*Id.* ¶ 38.)

Defendants argue that the Court should dismiss Plaintiffs' Equal Protection claim because they "fail to plead specific examples of inspections that were similar to those" of Plaintiffs, such as the "failure to provide and/or maintain fire safety facilities and equipment for [] tenants." (Defs.' Mot., Dkt. 32-6, at 23–24.)  But Plaintiffs provide specific enough comparisons to survive a motion to dismiss.  For instance, Plaintiffs allege that Defendants ticketed them for "abandoned vehicles on their property" (*see* Am. Compl., Dkt. 22, ¶ 70a–c), but did not ticket the other specified owners, including Mayor Hubbard's mother, for having "abandoned and unregistered automobiles" on their properties (*id.* ¶ 28).  Plaintiffs also allege that Defendants ticketed them for "creating a nuisance by having junk visible on their property" (*id.* ¶ 70d–g), but did not ticket the other owners for having "the same exact conditions," including "peeled paint (including paint chips on the grass), rubbish, debris," and "dangerous electrical wires" on their properties (*id.* ¶ 28).

That these other owners did not *also* have fire-safety violations does not explain why Defendants selectively issued tickets for the vehicle and junk violations.  And Plaintiffs list the names of the other owners they allege were not ticketed.  (*Id.*)  As noted, "[t]he question of whether parties are similarly situated is generally a fact-intensive inquiry that depends heavily on the particular context of the case at hand," which is why the Second Circuit has "cautioned against deciding whether two comparators are similarly situated on a motion to dismiss."  *Hu*, 927 F.3d at 97 (citations, quotations, and alterations omitted).  The Court thus declines to find the Amended Complaint deficient in this respect.[18]

Further, Plaintiffs do not rely solely on comparisons with similarly-situated owners.  They also point to Defendant Wingate's statement "that the Village of Greenport currently has a 'Spanish problem.'"  (Am. Compl., Dkt. 22, ¶ 38.)  Although such a stray remark, standing alone, would be insufficient to give rise to an inference of impermissible motive, *see Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112 (2d Cir. 2019), Defendant Wingate's comment directly pertains to the discriminatory action alleged—*i.e.*, ticketing Plaintiffs for leasing to Spanish, Hispanic, and non-white tenants.  When this allegation is coupled with the assertions of disparate treatment, the Amended Complaint states an Equal Protection claim pursuant to Section 1983.  *See id.* ("When other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,'

---

[18] In their Reply, Defendants make the confusing argument that "[P]laintiffs concede that the other property owners are not 'similarly situated' because those properties were not occupied by Spanish, Hispanic or non-white people."  (Defs.' Reply, Dkt. 33-2, at 7 n.7.)  Of course, the point of the comparator analysis is to show disparate treatment of similarly-situated people "*outside* of the protected group."  *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) (emphasis added).  That Plaintiffs and the comparator property owners had tenants belonging to different racial groups is precisely what gives rise to the inference that the alleged disparate treatment—*i.e.*, the ticketing and fining of property owners for health-and-safety-code violations—was race-based.

and the jury has a right to conclude that they bear a more ominous significance." (citation and quotations omitted)).

Thus, Plaintiffs' Equal Protection claim pursuant to Section 1983 may proceed against Defendants Ward and Wingate.

## VII.   State Law Trespass

Plaintiffs also bring state law trespass claims against Defendants Morris, Smith, Ward, and Wingate.  (Am. Compl, Dkt. 22, ¶¶ 74–94.)  Those claims may proceed against Ward and Wingate, but are dismissed, without prejudice, against Morris and Smith.

### A.   Legal Standard – Trespass Under New York Law

"[A] federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise."  *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. §§ 1367(a), (c)).

"The essential elements of a cause of action sounding in trespass are the intentional entry onto the land of another without justification or permission."  *211-12 N. Boulevard Corp. v. LIC Contracting, Inc.*, 128 N.Y.S.3d 551, 560 (N.Y. App. Div. 2020) (citation and quotations omitted). "Entering upon the land of another without permission, even if innocently or by mistake, constitutes trespass."  *Curwin v. Verizon Commc'ns (LEC)*, 827 N.Y.S.2d 256, 257 (N.Y. App. Div. 2006) (citations omitted).  "[N]ominal damages are presumed from a trespass even where the property owner has suffered no actual injury to his or her possessory interest."  *Hill v. Raziano*, 880 N.Y.S.2d 173, 175 (N.Y. App. Div. 2009).  Although government officers "are privileged to enter private property without committing trespass when they do so for a public purpose," *Hicks v. City of Buffalo*, 124 F. App'x 20, 25 (2d Cir. 2004) (summary order) (citing *People v. Czerminski*, 464 N.Y.S.2d 83, 83–84 (N.Y. App. Div. 1983)), "a warrantless search cannot generally be said to serve a public purpose" unless "there is valid consent to the search," *id.* (citing

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)), "or if the search is otherwise justified by 'exigent circumstances,'" *id.* (quoting *United States v. Gordils*, 982 F.2d 64, 69 (2d Cir. 1992)).

"To succeed on a trespass claim under New York law, a plaintiff must show an interference with its right to possession of real property." *Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491, 503 (2d Cir. 2020) (citation, quotations, and brackets omitted). "The right to possession is thus 'an essential element of a trespass action.'" *Id.* (quoting *Niagara Falls Redevelopment, LLC v. Armand Cerrone, Inc.*, 814 N.Y.S.2d 427, 428 (N.Y. App. Div. 2006)). "[P]laintiffs cannot assert a cause of action under New York law for trespass on property owned and used entirely by another." *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 201 (2d Cir. 2001).

### B. Plaintiffs Adequately Plead Their State Law Trespass Claims Against Ward and Wingate

For the reasons discussed with respect to Plaintiffs' Fourth Amendment Search claims, the trespass claims against Ward and Wingate may proceed, and the Court exercises supplemental jurisdiction as to those claims since they are based on the same "nucleus of operative fact" as the Fourth Amendment claims against these Defendants. *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (quoting *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004)). According to the Amended Complaint, on February 1, 2016, Ward and Wingate intruded onto Plaintiffs' private property, *i.e.*, the basement to the Complex, without consent. (Am. Compl., Dkt. 22, ¶ 58.) The Court rejects Defendants' argument that "Wingate's and Ward's entry onto the property does not amount to trespass because they obtained consent from [a] tenant." (Defs.' Mot., Dkt. 32-6, at 24.) Again, Defendants rely on Ward's affidavit to show consent. Because "a district court errs when it considers affidavits and

exhibits submitted by defendants" in reviewing a motion to dismiss under Rule 12(b)(6), *Friedl*, 210 F.3d at 83, the Court rejects Defendants' argument.

As to Morris and Smith, however, the Court declines to exercise supplemental jurisdiction over Plaintiffs' trespass claims. *See Carlsbad*, 556 U.S. at 639 ("[A] federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise." (citation omitted)). Because trespass is a state law claim, the Court may exercise supplemental jurisdiction if the claim is "so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Shahriar*, 659 F.3d at 245 (quoting 28 U.S.C. § 1367(a)). "For purposes of section 1367(a), claims form part of the same case or controversy if they derive from a common nucleus of operative fact." *Id.* (citation and quotations omitted). Further, district courts may "decline jurisdiction of state-law claims on discretionary grounds without determining whether those claims fall within their pendent jurisdiction." *United States ex rel. Hanks v. United States*, 961 F.3d 131, 137 (2d Cir. 2020) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)).

As noted, the only federal claims against Morris and Smith, the Fourth Amendment Search claims, have been dismissed. No federal claim remains in this case that arises from Morris's and Smith's actions on November 22, 2017 or "derive[s] from a common nucleus of operative fact." *See Shahriar*, 659 F.3d at 245 (citation and quotations omitted). The trespass claims against Morris and Smith are, at this point, essentially a separate lawsuit against parties not involved in the remaining federal action, and arising solely under a state law trespass theory. The Court therefore declines to exercise supplemental jurisdiction over these claims. *Cf. Lautman v. 2800 Coyle St. Owners Corp.*, No. 13-CV-967 (ARR) (VVP), 2014 WL 2200909, at *8 (E.D.N.Y. May

40

23, 2014) (dismissing state law claims when "[a]n evaluation of [those] claims would require the court to examine the conduct of the defendants against whom the federal claims have been dismissed").

## VIII.   Municipal Liability

In addition to the individual Defendants, the Amended Complaint names the Village ("a municipal corporation or other municipal entity") (Am. Compl., Dkt. 22, ¶ 4), the Building Department & Code Enforcement ("a department of the Village") (*id.* ¶ 5), and each individual Defendant in his or her official capacity (*see id.* ¶¶ 6–18).

### A.   Legal Standard – Municipal Liability Under Section 1983

"Although § 1983 subjects only 'persons' to liability," the 1978 Supreme Court case, *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), "established that a municipality . . . is a person within the meaning of Section 1983." *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019) (citation, quotations, and alterations omitted).  "To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Id.* (citation omitted).  "*Monell* liability attaches only where an infringement of constitutional rights is caused by a local government policy." *Id.* at 757 (citation omitted).  "In searching for the proper *local* government that is subject to liability on a given *Monell* claim[,] [courts] look for 'those official or governmental bodies who speak with final policymaking authority concerning the action alleged to have caused the particular violation at issue.'" *Id.* (quoting *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989)) (alterations omitted).

"'Official municipal policy includes' not only 'the decisions of a government's lawmakers,' but also 'the acts of its policymaking officials, and *practices* so persistent and widespread as to practically have the force of law.'" *Outlaw v. City of Hartford*, 884 F.3d 351,

41

372 (2d Cir. 2018) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).  "These are actions for which the municipality is actually responsible." *Id.* (quoting *Connick*, 563 U.S. at 61).  In such cases, "the plaintiff must show a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Hernandez v. United States*, 939 F.3d 191, 207 (2d Cir. 2019) (quoting *Connick*, 563 U.S. at 61).  "[T]he mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 403–04 (2d Cir. 2018) (citation, quotations, and alterations omitted).

### B.      Plaintiffs Fail to Adequately Allege Municipal Liability

Plaintiffs assert that "[t]he Village of Greenport and Village of Greenport Code Enforcement Officers [] Wingate and [] Ward put together and executed a scheme based on Greenport's custom and policy to keep the Spanish, Hispanic and non-white people out of the Village, whereby they would issue multiple, successive baseless tickets against [Plaintiffs]." (Am. Compl., Dkt. 22, ¶ 60.)  Plaintiffs further assert that Defendants Hubbard, Martilotta, Phillips, Roberts, Robins, and Pallas "together created a policy and custom of discrimination against Spanish, Hispanic and non-white people and the issuing of the baseless charges was in furtherance of that policy and custom." (*Id.* ¶ 64.)  Similarly, the Amended Complaint alleges that Morris and Smith "trespassed/intruded upon Plaintiff's property" as part of "a continuing course of conduct based on a custom and policy by the Village of Greenport." (*Id.* ¶ 74.)

These conclusory allegations do not give rise to a municipal liability claim. *See Cotto v. City of New York*, 803 Fed. App'x. 500, 504 (2d Cir. 2020) (summary order) (explaining that the plaintiff's "conclusory allegations that the City's policy, custom, practice, or failure to train its employees led to her constitutional rights being violated [were] insufficient to survive a motion to dismiss").  As noted, "the mere assertion that a municipality has such a custom or policy is

insufficient in the absence of allegations of *fact* tending to support, at least circumstantially, such an inference." *Montero*, 890 F.3d at 403–04 (emphasis added) (citation, quotations, and alterations omitted).  Plaintiffs do not provide any support for the conclusions that the various municipal entities or officials created a "policy and custom" of discrimination or Fourth Amendment violations.  *Cf. Acosta v. City of New York*, No. 11-CV-856 (KBF), 2012 WL 1506954, at *11 (S.D.N.Y. Apr. 26, 2012) (dismissing a failure-to-train *Monell* claim that merely recited the elements of the cause of action); *Brown v. City of New York*, No. 18-CV-3287 (JPO), 2021 WL 1225948, at *2 (S.D.N.Y. March 31, 2021) (dismissing a claim that simply "parrot[ed]" the legal standard without providing "specific facts or circumstances" (citation and quotations omitted)).

The municipal liability claims against the Village and Defendants Hubbard, Martilotta, Phillips, Roberts, Robins, Pallas, and Brandt, to the extent they are being sued in their official capacities, therefore must be dismissed.[19]

## CONCLUSION

Defendants' motion to dismiss is granted in part and denied in part.  Plaintiffs' Fourth Amendment Search claims may proceed as to Defendants Ward and Wingate, but are dismissed as to all other Defendants.  Plaintiffs' Fifth Amendment Takings claims are dismissed as to all Defendants.   Plaintiffs' Eighth Amendment Excessive Fines claims are dismissed as to all Defendants.  Plaintiffs' Fourteenth Amendment Equal Protection claims will proceed against Defendants Ward and Wingate, but are dismissed as to all other Defendants.  Plaintiffs' trespass

---

[19] Insofar as Plaintiffs allege separate claims against the Village and the Building Department & Code Enforcement, which the Amended Complaint describes as "a department of the Village" (Am. Compl., Dkt. 22, ¶ 5), the latter entity also must be dismissed because it is "merely [an] administrative arm[] of [the] municipality [and] do[es] not have a legal identity separate and apart from the municipality."  *Avant v. Miranda*, No. 21-CV-974 (JS) (SIL), 2021 WL 1979077, at *2 (E.D.N.Y. May 18, 2021) (citation omitted).

claims may proceed against Defendants Ward and Wingate, but are dismissed as to Defendants Morris and Smith without prejudice to refiling in state court.  Plaintiffs' municipal liability claims are dismissed.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  September 30, 2021
        Brooklyn, New York